Freeman, J.,
delivered tlie opinion of the court:
The defendant was convicted of involuntary manslaughter and sentenced to one year’s confinement in the penitentiary.
The ease is this: The parties had a settlement of an account to make between them. The defendant had worked for Gatewood, the deceased, and claimed pay for two days’ labor, which Gatewood disputed. They seemed to have attempted to settle before the day of the difficulty, probably, and failed; they agreed to meet at a store in Palmersville, and the proprietor, Mr. Burnett, was to make the settlement for them. They met at the time, and Burnett commenced to adjust the account; when the two items of difference were reached they commenced to- dispute about them. Defendant drew out his account book, and insisted that the items were correct, saying to Gatewood, “1 put them down exactly as you told me.” Gatewood replied, “It’s a damn lie.” At this juncture, Burnett says he stepped between them, ordered them to be quiet, and the dispute ceased for a time; shortly the dispute arose again. When it commenced this time the lie seems to have been charged between them, the weight of the testimony being that Bowling gave the lie to Gatewood in reply to a similar charge against him, when Gatewood struck him with his fist, and continued striking as rapidly as he could, holding- either the collar or the hair of defendant, keeping *112 bis bead drawn down, and while in tbis position, defendant drew bis pistol and shot Gatewood, when tbe parties were separated. Gatewood was sbot near tbe center of tbe abdomen, tbe ball ranging upwards, entering tbe cbest, from which wound tbe party died tbe next day.
The testimony of tbe state shows that when Gatewood first called Bowling a ’'liar,” or a “damn lie,” Bowling got up and pulled up bis sleeves and “popped” bis fists in bis bands, showing anger and resentment evidently. But no fight took place then, tbe parties being quieted by Burnett, who required them to desist. Soon after tbis, tbe second dispute arose, when Gatewood probably charged tbe lie again, and Bowling replied that Gatewood bad lied, or that be was more than a damn lie than Gatewood, when Gate-wood immediately struck him a severe blow, seized him either by the hair or collar, holding bis bead down, and beating him severely, and finally in tbe face with bis fists.
Bowling did not strike back, but held up bis-left hand, attempting to ward off tbe blows.
He very soon got out bis pistol with bis right band, and when be did SO, be fired.
In the scuffle be was pushed back until he was nearly, if not quite against the wall of tbe bouse; there was no manner of escape, even if tbe violence of tbe assault would have permitted it, and be, bad desired to' escape.
Tbe proof shows Gatewood to have been a heavier man than tbe defendant by twenty-five or thirty pounds, and of more than ordinary strength. It also shows tbe defendant to have been of but moderate strength for bis size, and rather a sickly man, as some of tbe witnesses express it.
In a struggle between them, while be might have made some resistance, it is evident be would very soon have been powerless in tbe hands of his Stronger adversary.
The fight could not have lasted a moment, we judge, yet in tbis time Bowling’s face was badly bruised and generally “bunged up,” as tbe witnesses say, as well as severely *113 injured in several places — in.a word, be was badly beaten, and would no doubt bave been most severely injured if be bad not- shqt bis opponent.
On. these facts tbe question is whether we can say die verdict of tbe jury should be reversed because there is a preponderance of tbe testimony against tbe finding.
Tbe rule of law as laid down by this court, in tbe case of Young v. The State, 11 Hum., 200, as to tbe right to ldll in self-defense, is this: “Whether a person who is assaulted by another will be justified in using, in tbe first instance, such violence in bis resistance as will produce death, must depend upon tbe nature of tbe assault and tbe circumstances under wMeh it was committed. It may be of such a character that tbe party assaulted may reasonably, apprehend death, or great violence to bis person,” and if so, tbe ldlling is justifiable.
Now, if tbe reasonable apprehension of death, or great violence to tbe person from tbe character of tbe assault, will justify tbe use of a deadly weapon, then when such violence is being actually inflicted by a powerful man, superior in strength, with most determined energy, it is certainly equally justifiable.
This being so, we do not see bow it can be held on these facts tbe party Mlling was not acting witMn tbe spirit as well as tbe letter, of tbe above rule.
Tbe fact may be urged of tbe pistol being carried to tbe place of meeting, as an unlawful act, but this cannot change tbe character of tbe act.
It might bave been unlawful to carry tbe weapon, but that offense cannot interfere with bis.right to use it, in Ms proper self-defense, where the facts justified bis action to save Ms life or person from great violence.
He might bave been punished for tbe offense of carrying tbe weapon, as tbe law requires, .but cannot h,e made guilty of an unlawful homicide because of fhe o.ther offence. *114 They stand distinct, the one act from the other, and in addition, it is clear there was no purpose to use the weapon except in self-defense.
If a man may kill in self-defense, when great violence is threatened, or being inflicted on his person, he must, of necessity, be allowed to use the means in his reach in the justifiable act.
To allow the defense and deny the use of the means to render it effectual, would be a fraud.
The case must stand on the facts connected with the assault, no previous malice being shown. The means by which the great bodily violence is being threatened or inflicted, whether by the use or threatened use of weapons, or by the overpowering strength of a stronger man, can make no difference; it is the fact of such violence, real and threatened, that gives the right of self-defense. Where such fact of real violence is found, and the party certainly exposed to it, or honestly believes himself so, then the right to defend against it is an essential element of every free man involved in the proposition that every man is entitled to enjoy life and liberty.
The right to life involves necessarily the right to- protect it, the right to defend the person - from such violence as threatens it, and the right to personal security involves the right to resist effectually all assaults that infringe upoii it, and when the violence threatened is great and imminent, gives the right to kill, if need be, to- save the person from such wrong.
The law, as well as justice 'and humanity, favors the right of the weak, and, consequently defenseless, against the violence of superior strength, when used to outrage, beat, and crush the weaker opponent.
If- a man of equal strength to- defendant had armed himself with a bludgeon, thus giving the additional advantage, by which' he might have been able to inflict the same amount of injury as Gatewood was inflicting on the defend *115 ant, no doubt could be bad that, in resisting sucb'an attack, death would have been justifiable. Certainly the fact that in one case the injury happens to be inflicted by the fist, and in the other by a bludgeon held in the fist, can make no difference in the right of the party suffering the violence to defend himself.
The fact that the verdict of the jury rebuts the idea of malice, and the proof leads to the same conclusion, leaves the case to stand solely upon the rights of the party to kill to prevent actual violence of the severest character short of death, when inflicted by the blows of a fearful adversary whose strength he was unable to resist in a struggle, we cannot say he was criminal in freeing himself from such violence by the only means in his reach.
Reverse and remand.